IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

JOEANN WHARTON
JOHN WHARTON

Criminal No. ELH-13-0043

## MEMORANDUM OPINION

This case involves allegations that defendants Joeann and John Wharton engaged in criminal misconduct from 1996 to 2012, in connection with their improper receipt of various types of Social Security benefits.  Joeann Wharton was initially indicted on January 31, 2013 (ECF 1), and charged in two counts: theft and conversion of SSI program benefits, in violation of 18 U.S.C. § 641 (Count One), and fraud in connection with receipt of Social Security disability benefits, under 42 U.S.C. § 1383a(a)(3) (Count Two).  In an eight-count Superseding Indictment filed on June 27, 2013 (ECF 19), Ms. Wharton's husband, John Wharton, was added as a defendant, and additional charges were included, all related to or arising from the alleged unlawful receipt of various types of Social Security benefits.

The Whartons were married in 1970, when Ms. Wharton was 16 years of age and Mr. Wharton was 29.  Although they have never divorced, the status of their marriage and the details of their living arrangements during the relevant time period are central to the case and have been vigorously contested.

Several motions are pending.[1]  Ms. Wharton has moved to suppress evidence recovered during execution of a search warrant on July 2, 2013, for a single family, two-story row home owned by defendants and located on Utrecht Road in Baltimore.  Ms. Wharton contends that the warrant was obtained in violation of her rights under the Fourth Amendment to the United States Constitution.  Defendants have also moved to suppress statements they made to two agents from the Social Security Administration's Office of the Inspector General during an interview at the Whartons' home on August 27, 2012.  They argue that the statements were made involuntarily and that introduction of the statements at trial would violate their rights under the Fifth Amendment to the United States Constitution.

A number of filings by the parties are relevant to the issues at hand.  In particular, Ms. Wharton filed a Motion to Suppress Statements (ECF 9); a Consolidated Pretrial Motion (ECF 37); a Reply in support of the Consolidated Pretrial Motion (ECF 60); a Prehearing Memorandum (ECF 111); and a Statement of Points and Authorities (ECF 125).  In addition to adopting all of Ms. Wharton's motions (ECF 34), Mr. Wharton also filed a Motion to Suppress Statements (ECF 35); a Reply in support of his Motion to Suppress (ECF 61); and a Supplemental Brief regarding the August 27, 2012 statements (ECF 126).  The government's filings are at ECF 43, ECF 64, and ECF 114.

---

[1] The Court has previously addressed other defense motions, including the defense's motion to dismiss the indictment and request for a bill of particulars, *see* ECF 91, 92 (Memorandum Opinion and Order), as well as the issue of Ms. Wharton's competency to stand trial.  *See* ECF 109, 110 (sealed Memorandum Opinion and Order).

The Court conducted an evidentiary hearing on June 2 and June 3, 2014.  The Court heard testimony from the defendants' adult children, Lasean Wharton ("Lesean")[2] and Tasha Wharton Muriel, and the defendants' granddaughters, Chaquiera Wharton, now 18, and Essence Wharton, now 21, as well as Special Agent Mark Gray from the Social Security Administration's Office of the Inspector General.  Oral argument was presented on July 1, 2014.

This Memorandum Opinion reflects the Court's findings of fact and conclusions of law, in accordance with Fed. R. Crim. P. 12(d).

### Discussion

### A.  Search Warrant

On July 1, 2013, the government applied for a search warrant for defendants' Utrecht Road home, seeking evidence relating to crimes allegedly committed by Mr. Wharton.  At that point, the Superseding Indictment had been filed but not yet unsealed.  *See* ECF 19, 23, 24. Agent Gray submitted an Affidavit in support of the search warrant application.  ECF 114-1 ("Gray Aff.") ¶ 3.  Attachment B to the warrant application described the items to be seized, which were items relating to Mr. Wharton's alleged use of a false identity (*i.e.*, the identity of James Wharton) to obtain Social Security benefits.  The warrant application did not seek items belonging to Joeann Wharton.  Magistrate Judge Stephanie Gallagher approved the search warrant application on the same day.  ECF 114-1.  The search warrant was executed the next day, July 2, 2013.  According to the defense, the government searched all three floors of the

---

[2] To avoid confusion between Lesean Wharton and John Wharton, I will sometimes refer to Lesean Wharton by his first name.

Wharton home and seized documents on the first and second floors that related to both John and Joeann Wharton. ECF 111 at 3.

Ms. Wharton claims that Agent Gray omitted material information from his Affidavit that, if included, would have defeated probable cause to search the first and second floors of the house. *See Franks v. Delaware*, 438 U.S. 154 (1978). In particular, Ms. Wharton maintains that she and Mr. Wharton, although legally married, were estranged and occupied separate areas of the house, with Ms. Wharton living on the first and second floors of the house and having her own bedroom, and Mr. Wharton living in the basement. Moreover, Ms. Wharton insists that the government, including Agent Gray, was aware of the Whartons' living arrangements, and intentionally or recklessly omitted information about the living arrangements from Agent Gray's Affidavit. According to Ms. Wharton, Judge Gallagher would not have found probable cause to search the first and second floors of the house had the Affidavit included the omitted information.[3]

Before addressing the parties' contentions, I pause to review the law that frames a challenge to a facially valid search warrant.

---

[3] Although Mr. Wharton purported to adopt all of Ms. Wharton's motions (ECF 34), Ms. Wharton's motion to suppress evidence obtained from the search is not one that can be "adopted" in any real sense by Mr. Wharton. This is because "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States,* 394 U.S. 165, 174 (1969). In other words, the rights asserted by Ms. Wharton in her motion cannot be asserted vicariously by Mr. Wharton. *United States v. Rumley,* 588 F.3d 202, 206, n. 2 (4th Cir. 2009). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. at 134.

"An accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). However, the Supreme Court established a narrow exception to this rule in the seminal case of *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* established that, under limited circumstances, an accused is entitled to an evidentiary hearing concerning the veracity of statements in an affidavit. In order to obtain an evidentiary hearing regarding the integrity of an affidavit, a defendant must first make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155–56. As the Supreme Court said, this showing "must be more than conclusory," and "must be accompanied by an offer of proof. . . . Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171; *see United States v. Shorter*, 328 F.3d 167, 170 (4th Cir. 2003). So, "where police have been merely negligent in checking or recording the facts relevant to a probable-cause determination," it is not enough for a *Franks* hearing. *Franks*, 438 U.S. at 170.

Second, the false information must be essential or material to the probable cause determination. *Id.* at 171–72. In other words, the defendant must make an initial showing that, without those false statements, the affidavit cannot support the finding of probable cause. *United States v. McKenzie-Gude,* 671 F.3d 452, 462 (4th Cir. 2011); *United States v. Clenney,* 631 F.3d 658, 663 (4th Cir. 2011). On the other hand, if the allegedly false statements are not necessary for the probable cause finding, the accused is not entitled to a *Franks* hearing. *Franks,* 438 U.S. at 155–156; *see also United States v. Doyle*, 650 F.3d 460, 468 (4th Cir. 2011) (stating that "false

information will only void a warrant if the information was necessary to the finding of probable cause").

Of relevance here, *Franks* also applies when an affiant omits material facts "'with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading.'" *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (citation omitted). *See United States v. Cioni*, 649 F.3d 276, 286 (4th Cir. 2011) ("[O]missions can, in certain circumstances, give rise to a *Franks* hearing. . . ."). But, "[m]erely identifying factual omissions is insufficient." *Clenney*, 631 F.3d at 664. To be material under *Franks*, an omission must be "necessary to the finding of probable cause." *Franks*, 438 U.S. at 156; *Colkley*, 899 F.2d at 301. So, "to obtain a *Franks* hearing, the defendant must show that the omissions were '*designed to mislead, or . . .* made in *reckless disregard of whether they would mislead*' and that the omissions were material, meaning that their 'inclusion in the affidavit would defeat probable cause.'" *Clenney*, 631 F.3d at 664 (quoting *Colkley*, 899 F.2d at 301) (emphasis in *Clenney*). In *Colkley,* the Fourth Circuit said, 899 F.2d at 301: "For an omission to serve as the basis for a hearing under *Franks*, it must be such that its inclusion in the affidavit would defeat probable cause . . . ."

If the defendant is granted a *Franks* hearing and the defense establishes the affiant's material perjury or recklessness by a preponderance of the evidence, the offending portion of the warrant "'must be voided' and evidence or testimony gathered pursuant to it must be excluded." *Colkley*, 899 F.2d at 300 (quoting *Franks*, 438 U.S. at 156). In other words, the defense must establish, through testimony and evidence, the facts it proffered in order to justify the *Franks* hearing. If those facts are established by a preponderance of the evidence, the evidence gathered pursuant to the invalid portion of the warrant must be excluded.

Several cases elucidate the *Franks* analysis.  In *Colkley*, 899 F.2d 297, a bank robbery case, the defendant, Johnson, complained that the district court should have suppressed his post-arrest incriminating statements, because the affidavit in support of the arrest warrant did not recount that six eyewitnesses who were shown a photospread that included Johnson failed to identify Johnson as one of the robbers.  In addition, he complained because the agent based the composite height description of the vault robber, who was allegedly Johnson, on the testimony of only one witness, disregarding other witnesses who described the vault robber as shorter than as depicted in the affidavit.  On this basis, Johnson requested and actually received a hearing under *Franks*.

The Fourth Circuit disagreed with the district court's conclusion that a *Franks* hearing concerning the integrity of the affidavit was required in the first instance.  The *Colkley* Court observed that any decision to omit information from an affidavit is, in some sense, intentional.  899 F.2d at 300.  It reasoned that if, as the district court in *Colkley* had concluded, the information need only to have been omitted knowingly, *Franks*' intentionality requirement would be satisfied in virtually every case.  *Id.*  The *Colkley* Court said: "*Franks* clearly requires defendants to allege more than 'intentional' omission in this weak sense."  *Id*. at 301.  Instead, said the Court, "*Franks* protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate . . . .  To obtain a *Franks* hearing, the defendant must show that the omission is the product of a 'deliberate falsehood or of reckless disregard for the truth.'"  *Id.* (quoting *Franks*, 438 U.S. at 171).  In other words, mere negligence is not enough.  *Franks*, 438 U.S. at 170.  Moreover, the *Colkley* Court recognized that "the affirmative inclusion of false information in an affidavit is more likely to present a question

of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." *Colkley*, 899 F.2d at 301.

The *Colkley* Court concluded that Johnson had made no showing of the requisite intent to mislead. The most that the record revealed was the agent's "failure to include the photospread information." *Id*. As to that conduct, the Fourth Circuit concluded that the agent's "acts fell far short of the level of flagrant police action *Franks* is designed to prevent, and a hearing under that decision was not required." *Id*. And, the Court declined to infer intent, bad motive, or recklessness from the fact of omission. *Id*.

The Fourth Circuit reiterated that intentionality and materiality are distinct components. *Id*. With respect to the probable cause component, the Fourth Circuit said that, "to be material under *Franks*, an omission must do more than potentially affect the probable cause determination: it must be 'necessary to the finding of probable cause.'" *Id*. (quoting Franks, 438 U.S. at 156). The Court continued: "For an omission to serve as the basis for a hearing under *Franks*, it must be such that its inclusion in the affidavit would defeat probable cause for arrest." *Colkley*, 899 F.2d at 301. And, the Court said, "omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Id*.; *see also, e.g.*, *Cioni,* 649 F.3d at 286 (*Franks* inapplicable when inclusion of the omitted facts would not have changed the "probable cause calculus").

In the *Colkley* Court's view, to the extent that the photo spread information was exculpatory, it was not enough to defeat probable cause when weighed against the information that was contained in the arrest warrant affidavit. The Court stated, *id*. at 303: "[A] requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the

warrant process.  The rule would place an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded."  The Court concluded: "In short, a rule requiring affiants to disclose all potentially exculpatory information has nothing to recommend it.  Unless a defendant makes a strong preliminary showing that the affiant excluded critical information from the affidavit with the intent to mislead the magistrate, the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity."  *Id*. at 303.

The case of *United States v. Tate*, 524 F.3d 449 (4th Cir. 2008), stands in marked contrast to *Colkley*.  In that case, the defendant challenged the veracity of a search warrant affidavit.  He claimed that, notwithstanding assertions in the affidavit, his trash had not been abandoned, and therefore the search of it was unconstitutional.  Thus, he insisted that the results of the search of his trash could not be considered in evaluating the search warrant application for his home.

In particular, Tate alleged that the police officer had committed a trespass by entering Tate's fenced backyard.  Further, he claimed that the portion of the affidavit regarding the investigation of his trash was constructed intentionally to mislead the state judge into assuming that the investigation and examination of his trash had been conducted legally.  In essence, Tate claimed that the officer had trespassed to obtain his trash, and seized it when it had not been abandoned, in violation of *California v. Greenwood*, 486 U.S. 35 (1988).  On that basis, he claimed he was entitled to a *Franks* hearing.

To support his request for an evidentiary hearing, Tate proffered substantial evidence to the court.  The evidence included a letter from the Division Chief of the Baltimore Department

of Public Works' Bureau of Solid Waste as to when the defendant's trash collection occurred; he submitted two affidavits, one from a neighbor and another from a defense investigator concerning the trash pickup and where his garbage was stored; he submitted a number of photographs of the residence showing a locked gate and the area where the trash was kept; and he submitted a copy of another search warrant affidavit two months earlier in an unrelated case, in which the same officer stated that the trash bags were easily accessible in language quite similar to what was in the affidavit at issue.

The district court judge nevertheless denied the request for a *Franks* hearing.  On appeal, the Fourth Circuit concluded that the defendant had made the requisite substantial preliminary showing under *Franks* required for an evidentiary hearing to challenge the integrity of an affidavit submitted to support the issuance of a search warrant for Tate's home.  It focused on the agent's omission of facts about the location of trash that had been searched, the contents of which undergirded the search warrant affidavit for Tate's residence.

Through Judge Niemeyer, the Fourth Circuit said that, if Tate was correct about his proffered facts, the agent omitted important facts and circumstances that, if true, were essential to the constitutionality of the trash investigation.  The Court stated: "The proffered facts tend to show that Agent Manners may have violated Tate's reasonable expectation of privacy because the trash was not out at the curb for collection on the date of Agent Manners' search but rather in a container near the rear steps of the home."  524 F.3d at 456.  It continued: "If Tate's facts are correct, the affidavit omitted the important details . . . that the trash had not been abandoned, and that the trash bags were seized in violation of Tate's reasonable expectation of privacy."  *Id*. at 456.

Of import here, the Court reasoned, *id*. at 457: "We conclude . . . that if Tate's facts are true, the inclusion of the allegedly omitted information – that Agent Manners illegally searched Tate's trash – would have defeated probable cause.  If the trash investigation was conducted illegally, the facts derived from it would have to be stricken from the affidavit."  And, the Court said: "Without the facts drawn from the trash investigation, the remaining contents of the affidavit would not have supported a finding of probable cause."  *Id*. at 457.  Thus, the Court held that Tate had met his burden of making a substantial preliminary showing that the agent had knowingly and intentionally, or with reckless disregard for the truth, omitted a material statement in the affidavit in support of the search warrant.  *Id*.

With the principles undergirding *Franks* in mind, I granted Ms. Wharton's request for a *Franks* hearing.  Unlike *Colkley*, the case at bar does not concern an arrest warrant.  This case involves a challenge to a search warrant, to which the Fourth Amendment's particularity requirement applies.  In my view, Ms. Wharton made "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was either included in the warrant affidavit, or omitted, and would have been essential or material to the probable cause determination."  Mot. Hrg. Tr. 1 at 32.  In granting the request, I said, *id*. at 21, 27, 32:

> [The defense has made a showing that] these are people not of economic means, or for whatever other reason, they bought this house together.  They live separately within the house.  They have chosen, not with the legal imprimatur of government, to informally subdivide it, but they have subdivided it for themselves.  He lives in the basement.  She lives elsewhere. And the government knew that.  That's the allegation.

*** *

And that clearly wasn't disclosed. So we can all agree on that, I think.  The
question is, would it have made a difference? . . . Because as I understand *Franks*,
the omission would have to be material to the probable cause determination.

\*\*\*

At least for me, I think it's a close question, but I think it would be
appropriate to hold a *Franks* hearing.

Thus, the question now before the Court is whether the evidence presented at the *Franks*

hearing showed, by a preponderance of the evidence, that information was omitted from the

warrant Affidavit; that the omissions were designed to mislead or made in reckless disregard of

the truth; and that the omissions were material, meaning that their "inclusion in the affidavit

would defeat probable cause."  *Clenney*, 631 F.3d at 664.  I turn to review the evidence.

Special Agent Gray submitted an Affidavit in support of a warrant to search defendants'

residence on Utrecht Road, identified as the "SUBJECT PREMISES."  Gray Aff. ¶ 3.  Agent

Gray averred that, since August 2012, he was the primary case agent assigned to an investigation

of Social Security fraud "by a married couple named John and Joeann Wharton."  Gray Aff. ¶ 8.

Agent Gray stated: "The Whartons are residents of Baltimore, Maryland, and currently reside at

the SUBJECT PREMISES."  Gray Aff. ¶ 8.  Agent Gray also averred that "there is probable

cause to believe that within the SUBJECT PREMISES, there exists evidence, fruits, and

instrumentalities of the crimes of Identity Fraud . . . , Social Security Number Fraud . . . , and

Theft of Government Property . . . ."  Gray Aff. ¶ 3.  An attachment to Agent Gray's Affidavit

described the property to be searched as follows, Gray Aff. at 11 (Attachment A):

[The home on] Utrecht Rd, Baltimore, Maryland 21206 is an attached
"row home" style residence.  The home has two visible stories and a dark grey-
shingled roof with three small windows trimmed in white facing the road and a
red brick chimney on the right side of the roof.  The first story has a red brick
exterior and one window trimmed in white.  The second story is covered with
dark grey shingles and there are two windows trimmed in white.  The home has

the numbers "5634" in black lettering on a white background between the door and the window on the first story.  The front door is white, with white shutters on either side of the door and it is located on the left side of the residence.

Agent Gray noted that the investigation began after the Whartons' adult daughter, Tasha Muriel, told a local SSA employee that Joeann Wharton had been serving as the representative payee for Muriel's nieces (*i.e.*, the Whartons' granddaughters), but that Ms. Wharton was not spending the benefits for the nieces' benefit.  *Id.*  The investigation subsequently expanded to include Ms. Wharton's receipt of disability and Medicaid benefits, Mr. Wharton's receipt of retirement benefits under the false identity "James Lee Wharton," and Ms. Wharton's receipt as representative payee of benefits for the defendants' son, Lasean.  *Id.*

Agent Gray's Affidavit made clear that he was "investigating various violations of federal criminal laws by John and Joeann,"[4] and that the "affidavit contains information to support a finding of probable cause to search the SUBJECT PREMISES for fruits, evidence, and instrumentalities of *John's violations* of statutes" specified in the Affidavit. Gray Aff. ¶ 10 (emphasis added).  The items that Agent Gray "believe[d] may be currently stored at the SUBJECT PREMISES" are documents pertaining to the aspects of the alleged fraud that are linked to John:  "(1) documents and records that may confirm whether 'James Wharton' is a synthetic identity or the identity of a real person; (2) the debit card associated with the James Wharton Citigroup bank account; (3) statements and other correspondence from Citigroup regarding the James Wharton bank account; (4) the Maryland Driver's License issued in the name of James Wharton; (5) the Social Security Card issued in the name of James Lee Wharton and bearing SSN xxx-xx-1376; and (6) documents and records reflecting employment at Uptown

---

[4] The relevant statutes are 18 U.S.C. § 1028; 42 U.S.C. § 408(a)(7)(B); and 18 U.S.C. § 641.  *See* Gray Aff. ¶ 4.

Press, Inc. and other employers by John in the name 'James Wharton.'"  Gray Aff. ¶ 21.  *See also id.* at 12 (Attachment B, specifying materials to be seized).

On the issue of the Whartons' living arrangements, Agent Gray referred to his interview of the Whartons in August 2012, stating, Gray Aff. ¶ 11:

> On August 27, 2012, your affiant and another special agent from SSA OIG interviewed John and Joeann at the SUBJECT PREMISES in relation to the initial allegation of fraudulent receipt by Joeann of Title XVI benefits intended for the benefit of her granddaughters Essence and Chaquiera Wharton . . . . During that interview, the Whartons stated that they had been married continuously for 43 years, and that they lived together at the SUBJECT PREMISES.

Further, Agent Gray averred, Gray Aff. ¶ 20:

> Your affiant knows that Baltimore Gas & Electric currently services the SUBJECT PREMISES and that the account is held in John's name.  Your affiant also knows that Dish Network currently provides cable television service to the SUBJECT PREMISES and that John and Joeann are listed on the account as authorized users.  *Your affiant also knows from interviews in June 2013 with Lasean Wharton and his sister Tasha Muriel that John and Joeann are currently living at the SUBJECT PREMISES.*  (Emphasis added.)[5]

Agent Gray's Affidavit did not include information indicating that the Whartons lived separately within the home, with Mr. Wharton occupying the basement and Ms. Wharton occupying the first and second floors.  As the defense points out, the Whartons' two adult children (Lesean Wharton and Tasha Muriel) and their two young adult grandchildren had all been interviewed before the application for the search warrant.  In addition, two were called to testify before the grand jury.  Notably, all four told the government, prior to the application for the search warrant, that, to their knowledge, Mr. Wharton resided in the basement of the home and Ms. Wharton resided on the second floor of the house.

---

[5] To be sure, this statement was accurate.  But, as discussed, *infra*, it did not fully capture what Lesean and Ms. Muriel stated as to their parents' living arrangements in the house.

A Report of Investigation submitted by Special Agent Gray on June 4, 2013, contains information regarding statements made by Lasean Wharton as to his parents' living arrangements at their home on Utrecht Road.  Def. Hrg. Exh. 4; ECF 37-8 ("Report of Investigation").  In particular, agents discussed that issue with Lasean Wharton during an interview on June 3, 2013.  The Report of Investigation indicates that, when asked whether his parents were still married and living together, Lasean "stated that they live in the same house, but from what he can tell his mother sleeps in the bedroom and his dad sleeps in the basement."  *Id.* at 2.  Further, when asked whether "there was a separate apartment in the basement," Lasean responded that his parents "share a kitchen and common areas."  *Id.*  Lasean believed that this separate living arrangement began around the time of the murder of his sister, LaShema, *id.*, which occurred in 2002.

Tasha Muriel, another adult child of the Whartons, testified under oath before the grand jury on June 6, 2013.  Among other topics, she was asked about her parents' living arrangements.  Ms. Muriel testified that, when her parents moved from New York to Maryland, they did so separately.  ECF 111-2 at 15.  Ms. Muriel was asked: "And are your parents currently together, or are they separated."  *Id.*  She responded:  "They live in the same house but in separate quarters, currently.  But then I don't know what happens, because I'm not interacting with them like that."  *Id.*  She was also asked whether her parents shared a bedroom, and she responded: "No.  To my knowledge, as far as I know, no, they're not."  *Id.* at 15–16.  Ms. Muriel explained that the home is "built like a one-family home, but he [*i.e.*, Mr. Wharton] has the basement."  *Id.* at 16.  Ms. Muriel added that her father "has bolted locks and all of this on the basement door.  He has his own entrance from the outside to come around to the kitchen."  *Id.* at 17.  But, she

indicated that her father "occasionally" would cook in the first-floor kitchen.  On the first floor, "the dining room and all of that is open up, too."  *Id.*

Lasean Wharton also testified under oath before the grand jury on June 6, 2013.  ECF 111-1.  He stated that although his parents "live in the same building," his father "lives downstairs" and his mother "lives upstairs."  *Id.* at 8.  He acknowledged that he had not been to the house in several months, and when he did go, he "would usually just go over there and check on" his motorcycle, which he stored in the backyard of the Utrecht Road home.  *Id.* at 8–9.

The grand jury transcripts were not yet prepared by the time of the search warrant application submitted to Magistrate Judge Gallagher on July 1, 2013.  However, Agent Gray testified that he would have been notified or alerted, as the case agent, if the grand jury testimony had conflicted with the information previously in his possession.[6]  *See* Mot. Hrg. Tr. 1 at 172.  In other words, Agent Gray confirmed his understanding that the grand jury testimony of Tasha Muriel and Lasean Wharton was consistent with the information that they had previously provided to the government.  *Id.*

In addition, in approximately June 2013, Agent Gray met with the young adult granddaughters of defendants, Essence Wharton, now 18, and Chaquiera Wharton, now 21.  They moved out of the Utrecht Road house in the summer of 2009 and had only visited once since that time.  Mot. Hrg. Tr. 1 at 98.  Thus, their knowledge was somewhat stale.  Nevertheless, they told Agent Gray that while they lived with their grandparents, the Whartons resided in separate portions of the home.  *Id.* at 57, 96–97, 110–114, 116.

---

[6] There is no transcript available in connection with the argument presented by counsel on July 1, 2014.  But, this assertion was advanced by the prosecutor.  Of course, even if the transcripts had not yet been prepared, the prosecutor would have known the content of the grand jury testimony, as he was the one who questioned the witnesses.

The defense also points to a Medicaid Fraud Calculation, which provides an address for Ms. Wharton of "5634 Utrecht Road[,] 1st Floor[,] Baltimore, MD 21206-2903." Def. Hrg. Exh. 7; ECF 37-9 (the "Medicaid Report"). The Medicaid Report was prepared by Special Agent Christopher Steinbauer and Special Agent Gray. *Id.* Although the Medicaid Report is undated, the defense avers that it was "prepared in anticipation of the superseding grand jury action in June, 2013." ECF 111 at 4.

The Whartons were interviewed by Agent Gray and his colleague in August 2012. During the interview, the Whartons portrayed themselves as a married couple jointly occupying the Utrecht Road house. Nevertheless, on December 11, 2012, Mr. and Ms. Wharton each mailed a letter to the SSA in which they expressly stated that they do not reside together, and had not resided together for many years. The return address on the envelope lists Joeann's living area as "Apt. # 2." Def. Hrg. Exs. 3A, 3B, 3C. In particular, Mr. Wharton wrote: "I John Wharton do not live or share [a household] with Joeann Wharton. She and I have been separated for 27 years." Def. Hrg. Exh. 3B. In her letter, Ms. Wharton wrote: "I [have] been separated for years. I live [alone] with no income, no money, no food." Def. Hrg Exh. 3C.

The record also contains documents from the Baltimore Public School System and the Baltimore County Department of Social Services. One references Ms. Wharton's residence as Apt. 2 and the other as Apt. 1, respectively. Def. Hrg. Exs. 5, 6. Despite the discrepancy in the actual apartment number, defendants point to these documents to show that the government knew that the defendants had divided the house into two units.

Finally, defendants point out that Ms. Wharton was indicted months before the search at issue and, from the inception of the case, the government knew that she had taken the position

that she and John Wharton were estranged and occupied separate units within the Utrecht Road property.  For example, on May 6, 2013, Ms. Wharton filed a Motion to Quash the grand jury subpoena issued to Ms. Muriel.  *See* Def. Hrg. Exh. 8.  Ms. Wharton asserted in the memorandum in support of the motion, *id.* at 1: "Joeann Wharton lives in Baltimore by herself. . . .  Her estranged husband, John Wharton, Sr., age 72, lives at the same address in a basement apartment."  A footnote on the same page explains, *id.* at 1 n.1: "Mr. Wharton took the basement as a separate apartment with a separate entrance.  Their finances are separate."

In connection with the suppression motion, the defense's basic argument proceeds as follows.  The government knew or should have known that the Utrecht Road house contained two separate units, one for Joeann Wharton and one for John Wharton; that the government purposefully did not disclose this information to the magistrate judge when seeking the search warrant, which sought evidence only pertaining to John Wharton, because it was not consistent with the government's view of the case; that there was no probable cause to search for evidence related to John Wharton in Joeann Wharton's living area; and the government gained access only by "creat[ing] the impression that John Wharton live[d] in that area as well."  ECF 111 at 1.  In other words, the defense contends that "the warrant is not valid because it fails to particularize the location to be searched."  *Id.* at 1–2.  Therefore, it contends that the evidence seized during the search must be suppressed.

To be sure, the government contests the veracity of the defense's account of defendants' living arrangements.  Indeed, much of its case depends on establishing that the Whartons were married and living together during the years that Ms. Wharton collected social security disability benefits.  Apparently, because the government did not believe the defense's position, it decided

that it did not have to disclose to Judge Gallagher the information that conflicted with its assessment of the facts.

The government makes three primary arguments.  For one, it argues that Agent Gray did not act with intent to deceive or with a reckless disregard for the truth in formulating his Affidavit.  ECF 114 at 10.  Second, it argues that, even if the information omitted from the Affidavit had been included, the "substantial indicia of joint residence contained in the affidavit" established probable cause to search the entire residence for evidence pertaining to John Wharton's offenses.  *Id.* (citing *McKenzie-Gude*, 671 F.3d at 459).  Finally, the government argues that, under the good faith exception recognized in *United States v. Leon*, 468 U.S. 897 (1984), and its progeny, Agent Gray's Affidavit "was not 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  ECF 114 at 10.

With these contentions in mind, I pause to review the precepts of Fourth Amendment jurisprudence that are relevant here.

The Fourth Amendment to the Constitution of the United States guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  "'[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable.'"  *United States v. Sowards*, 690 F.3d 583, 588 (4th Cir. 2012) (*quoting Wilson v. Arkansas*, 514 U.S. 927, 931 (1995)) (alteration in *Sowards*).

"'At the very core'" of the Fourth Amendment "'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  The Supreme Court has said: "[T]he Fourth Amendment has drawn a firm line at the entrance to

the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Silverman*, 365 U.S. at 511.

Of particular relevance here, the Warrant Clause of the Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized." U.S. Const. amend IV. This clause requires an affidavit supporting a request for a search warrant to show some factual basis for the belief that the suspect occupies or is otherwise connected to the targeted premises and that contraband or evidence will be found in that particular place.  This is known as the particularity requirement.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013); *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012); *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011).

In *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), the Supreme Court recognized that the purpose of the particularity requirement is to ensure "that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  Thus, "a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quotation and citation omitted).  With regard to the particularity requirement, the Fourth Circuit has said: "At its core, the Fourth Amendment protects against general warrants that authorize 'exploratory rummaging in a person's belongings . . . by requiring a particular description of the things to be seized.'" *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (internal quotation marks omitted)).  And, as the Fourth Circuit said in *United States v.*

*Foster*, 634 F.3d 243, 249 (4th Cir. 2011), albeit in another context, "the government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband."

When a building contains separate residency units, the warrant must specify the precise unit that is the subject of the search. *United States v. Perez*, 484 F.3d 735, 741 (5th Cir. 2007); *United States v. White*, 416 F.3d 634, 637 (7th Cir. 2005); *United States v. Hinton*, 219 F.2d 324, 325-26 (7th Cir. 1955); *United States v. Simpson*, 944 F. Supp. 1396, 1398 (S. D. In. 1996). So, "when a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit." *United States v. Butler*, 71 F.3d 243, 249 (7th Cir. 1995). As the Seventh Circuit said in *Hinton*, 299 F.2d at 325–26: "For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is not different than searching two or more completely separate houses. Probable cause must be shown for searching each house or, in this case, each apartment." However, as the *Perez* Court pointed out, there are exceptions to the rule. It said: "The warrant of a multi-unit structure will be valid where (1) there is probable cause to search each unit;[] (2) the targets of the investigation have access to the entire structure; or (3) the officers reasonably believed that the premises had only a single unit. *See Garrison*, 480 U.S. at 85–86; *United States v. Johnson*, 26 F.3d 669, 694 (7th Cir. 1994); *United States v. Gilman*, 684 F.2d 616, 618 (9th Cir. 1982).

In the seminal case of *Maryland v. Garrison*, 480 U.S. 79, the police obtained and executed a warrant to search a third floor apartment for controlled substances and related paraphernalia believed to be in the possession of an individual named McWebb. *Id.* at 81. Before executing the warrant, the police reasonably believed that there was only one apartment on the floor. Upon executing the warrant, they learned that the third floor was divided into two

apartments, one occupied by McWebb and one by an individual named Garrison.  Before the

officers became aware that they were in Garrison's apartment, however, they discovered the

contraband that provided the basis for Garrison's conviction for violating Maryland's Controlled

Substances Act.   In explaining the particularity requirement of the Fourth Amendment, the

*Garrison* Court said, *id.* at 79 (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)):

> The manifest purpose of this particularity requirement was to prevent general searches. . . .  "Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase."

The *Garrison* Court held:  "The validity of the warrant must be assessed on the basis of

the information that the officers disclosed, or had a duty to discover and to disclose, to the

issuing Magistrate."  *Id.* at 86.  Accordingly, because the officers did not know in advance that

the apartment was split into two units, the execution of the warrant did not violate Garrison's

Fourth Amendment rights.  In the Court's view, "the officers' conduct was consistent with a

reasonable effort to ascertain and identify the place intended to be searched within the meaning

of the Fourth Amendment."  *Id.* at 88.

As discussed, under *Franks* suppression is warranted when material information is

omitted from a warrant application because of an agent's intent to mislead the magistrate judge,

or due to reckless disregard for the truth.   I do not believe that the government omitted

information from the application with the intent to mislead Magistrate Judge Gallagher.

However, I am satisfied that relevant information was omitted from the warrant application "in

reckless disregard of whether [the omissions] would mislead[] the magistrate."  *Colkley*, 899

F.2d at 301 (emphasis omitted).

In his Affidavit, Agent Gray recounted evidence supporting his belief that the Whartons lived in the house as husband and wife, and jointly occupied the entire house.  At the hearing, Agent Gray pointed to what the government regarded as substantial indicia indicating that the Whartons lived in a shared household: the home was jointly owned by the Whartons; there was no outside indication of separate units within the home; the bills for utilities and cable were joint; the Whartons filed a 2007 tax return as a married couple; and they jointly filed for a homestead tax credit.  *Id.* at 170; *see* Mot. Hrg. Tr. 2 at 35–40.  But, these purely economic indicators do not necessarily dispose of the question.  It is not at all uncommon to own a building in which one does not even reside.  Certainly, mere ownership does not satisfy the particularity requirement.  Nor is it uncommon for two people to live together in order to share household expenses, occupying separate bedrooms while living under one roof.  And, even married couples, unhappy in their marriage, may choose to live under one roof, in divided space, because of economic considerations.

Here, the economic indicators are crucial to the allegations that the Whartons lived together and that Ms. Wharton committed Social Security fraud.  And, if Ms. Wharton was receiving financial support from Mr. Wharton at the time of her alleged criminal misconduct, then Ms. Wharton may have been ineligible for the Social Security benefits she had been receiving.  But, the search warrant at issue sought information related *only* to John Wharton's alleged use of a false identity.  In that context, economic indicators do not necessarily bear on the living arrangements at the Utrecht Road property.

Indeed, Agent Gray admitted as much when questioned by counsel for Ms. Wharton at the motions hearing, Mot. Hrg. Tr. 2 at 156–57:

Q: Now, incidentally, you said that the question for Social Security is whether two people have an economic household, correct?

A: The way I understand it, yes.

Q: But you understand that the concept of an economic household is different than the concept of particularity of a place to be searched for purposes of a search warrant, correct?

A: That's right.

Agent Gray also explained his reason for omitting the significant information indicating that the Whartons did not share a bedroom, and which suggested that the house was split into two units. Essentially, Agent Gray testified that he did not believe the statements by the Whartons, made in December 2012, or those of their adult children or their grandchildren, to the effect that Mr. and Ms. Wharton maintained separate living quarters within the house.

Clearly, the Whartons themselves gave conflicting statements, and the agent understandably chose to rely on the one that supported his view. But, he disregarded information obtained under oath from Ms. Muriel and Lasean, concerning their parents' living arrangements, on the belief that they made false statements in an attempt to protect their parents. *Id*. The agent did not identify any basis for his belief. Surmise may be useful and necessary during an investigation. But, the notion that the Whartons' adult children sought to protect their parents by misrepresenting their parents' living arrangements at the home on Utrecht Road is a dubious one. Indeed, there was no ground offered on which to conclude that the adult children lied under oath or were otherwise motivated to help or harm their parents.[7]

---

[7] Lesean Wharton and Ms. Muriel testified at the motions hearing and were, in my view, quite credible.

The government's interview of Lasean Wharton on June 3, 2013, is illustrative.  For instance, Lasean was not helpful to his mother's cause when he stated that he "thought [his mother] knew what she was doing" when she received SSA benefit checks for her granddaughters and, "without telling SSA that she was married and earning wages," received SSI payments from SSA.  Report of Investigation at 2.  To cite another example, Lasean stated near the end of the interview that "his mother took money from her grandaughter[s] that should have gone to Tasha Wharton because [the girls] were living with [Tasha] and Tasha was paying for everything that they needed."  Report of Investigation at 4.  He added that his mother "was greedy and got caught and now she has to pay for it."  *Id.*  Such statements by Lasean are hardly indicative of an effort to supply inaccurate information in order to help his parents.

As for Tasha Muriel, it was her action that led to the present criminal case.  In August 2012, Ms. Muriel "complained to a local SSA employee that [Ms.] Wharton had been acting as a representative payee for Muriel's nieces (Essence and Chaquiera Wharton), but not spending her nieces' benefits for their benefit."  Gray Aff. ¶ 8.

Moreover, it is far from clear that, particularly at the time that the Whartons' relatives provided their statements to the government, the Whartons' relatives would have understood that a given description of the living arrangements within the residence would prove helpful (or harmful) to John and Joeann Wharton.  And, based on the testimony of the granddaughters at the motions hearing, there is not a shred of basis to conclude that they were interested in assisting their grandparents.

It is also noteworthy that Agent Gray completely credited the statements of Lasean and Ms. Muriel when those statements inculpated the defendants.  Yet, to the extent that their

statements indicated the defendants occupied separate portions within the house, Agent Gray did not credit those statements.  No reasonable explanation was provided to explain this inconsistent treatment of statements from the same witnesses.  If the government thought that Lasean and Ms. Muriel were not reliable sources of information, the failure to note in the search warrant Affidavit such doubts as to their veracity is perplexing.  Alternatively, if the government thought that Lasean and Ms. Muriel were reliable, the failure to credit their testimony regarding the Whartons' living arrangements, or at least to disclose it to the magistrate judge, is equally disturbing.

The evidence about the Whartons' living arrangements available to Agent Gray at the time of his warrant application certainly cut both ways.  Agent Gray had some information, including the Whartons' own statements, the utility expenses, the absence of multiple mailboxes, and the like, indicating that the Whartons were not in a sham marriage and lived together.  But, he also had ample information indicating that theirs was a marriage in name only, that they lacked either the sophistication or the means to formally establish separate units within the home, but that they nonetheless took it upon themselves to live separately within the Utrecht Road house.

I have no doubt that Agent Gray and the prosecutor assessed that evidence and reached their own conclusion that the Whartons lived together throughout the entire house.  To conclude otherwise would have called into question the charges already pending against Ms. Wharton. But, it is the responsibility of the neutral judge to determine whether to issue a search warrant and, if so, the scope of that search warrant.  *McDonald v. United States*, 335 U.S. 451, 455 (1948).  As the Court said in *Simpson*, 944 F. Supp. at 1399: "For that fundamental protection to

have any value, the police must be candid with the judge and tell the judge about the facts they know that are material to determining probable cause and the scope of the probable cause." *See also United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984) ("If the government had unfettered power to pick and choose which facts to present to the magistrate regardless of how misleading the presentations were, the magistrate's review of the affidavit would be meaningless. The magistrate would not be provided with a fair opportunity to review the government's evidence in making the probable cause determination.").

"For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is not different than searching two or more completely separate houses. Probable cause must be shown for searching each house or, in this case, each apartment." *Hinton*, 219 F.2d at 325–26. *See also Garrison*, 480 U.S. at 91–92 ("[C]ourts have declared invalid those warrants that fail to describe the targeted unit with enough specificity to prevent a search of all the units."). Here, the agent and the prosecutor chose not to disclose to Magistrate Judge Gallagher, to whom the warrant application was presented, ample information suggesting that the defendants resided in entirely separate areas within their modest row home, despite the fact that much of that evidence was made under oath by two witnesses on whom the government otherwise relied. In my view, the omission of this information amounted to a reckless disregard for whether Magistrate Judge Gallagher would be misled into issuing the warrant.

The next question is whether this omission was critical to determining the scope of the search warrant. In answering this question, I must determine whether the inclusion of the omitted information "in the affidavit would defeat probable cause for [the search]." *Colkley*, 899 F.2d at 301. Probable cause to search is defined as "a fair probability that contraband or

evidence of a crime will be found in a particular place." *Illinois v. Gates*, *supra*, 462 U.S. at 238. Whether probable cause exists to justify the search depends on the totality of the circumstances. *Id.* at 241; *United States v. Humphries*, 372 F.3d 653, 657–58 (4th Cir. 2004).

As noted, the warrant application only sought information related to John Wharton's alleged identity fraud.  As discussed, Ms. Muriel, Lasean, and the granddaughters of the Whartons all indicated that the Whartons lived separately under one roof.  And, two testified under oath before the grand jury.  I am satisfied that if Magistrate Judge Gallagher knew what the witnesses said, and that two witnesses on whom the government relied had testified before the grand jury that John Wharton maintained separate living quarters in the basement of the house, and that Ms. Wharton had a separate bedroom on the second floor, she would not have concluded that there was a "fair probability" that evidence relating to Mr. Wharton's identity fraud would be found in Ms. Wharton's upstairs bedroom.

It is also noteworthy that the government has not identified any facts pointing to the probability that evidence of John Wharton's misuse of James Wharton's identity would be found in Ms. Wharton's bedroom.  Indeed, the facts relied upon by the government for a search of the house do not bear on the question of whether John Wharton's items would have been present in Joeann Wharton's bedroom.  For example, the shared cable bill might indicate that John Wharton had access to the common areas of the house, but not that he used the upstairs bedroom. Similarly, his presence at the interview conducted in the dining area of the home on August 27, 2012, clearly suggested that he had access to the first floor, but does not bear on whether he had access to the upstairs bedroom.

The evidence tending to suggest that John Wharton had access to the upstairs bedroom derives from the Whartons' comment during the interview in August 2012 that they were "happily married," and the only shower in the home is located on the second floor,[8] suggesting that Mr. Wharton had to go upstairs in order to shower.  *See* Mot. Hrg. Tr. 1 at 56–58, 62, 63, 68, 94–95, 102, 104, 112, 115.

As to the shower, the evidence showed that access was gained to the bathroom via the hall.  *Id.* at 119–20.  Thus, Mr. Wharton had no need to access Ms. Wharton's bedroom in order to use the shower.  With respect to the statement in August 2012 that the Whartons were "happily married," Agent Gray himself acknowledged that the Whartons had a motivation to misrepresent their marital status during the interview on August 27, 2012.  The agents had advised the Whartons that they were investigating the Whartons' care of their granddaughters, Essence and Chaquiera.  In such a circumstance, Special Agent Gray conceded that the Whartons had an incentive to

> represent[] themselves as a couple and that they were able to take care of Essence Wharton.  That's the feel I got for the interview when I walked in, is that they were attempting to make themselves look like they were capable parents to take care of Essence Wharton and to get the check back to them.  And so they offered up the fact that they are married and that they had been together for 43 years.

Mot. Hrg. Tr. 2 at 128.

Despite the Whartons' apparent motivation to prevaricate, Agent Gray did not view the "happily married" comments with the same degree of skepticism as that with which he viewed all prior and later evidence tending to suggest the opposite conclusion.  In short, there was substantial evidence suggesting that the Whartons maintained separate living quarters within the

---

[8] The basement contained a half bathroom.  Mot. Hrg. Tr. 1 at 56.

home, and reason to doubt the limited evidence suggesting the opposite.  At the very least, it was information that should have been disclosed to the magistrate judge.  The Affidavit should have included the contrary evidence, because Judge Gallagher would have known that, under the Fourth Amendment's particularity requirement, if a building is divided into separate units, probable cause must be shown for the search of each unit.

The case at bar is distinguishable from *Colkley*, discussed earlier in the context of *Franks*. In *Colkley*, involving an arrest warrant, the omitted information was neutral, not exculpatory— the eyewitnesses did not affirmatively rule out the defendant as one of the bank robbers; they simply could not say one way or the other.  And, there was ample evidence that the defendant was indeed one of the bank robbers.  Accordingly, the *Colkley* Court feared that requiring the inclusion of such neutral information would "open[] officers to endless conjecture about investigative leads, fragments of information, or other matter."  *Colkley*, 899 F.2d at 301.

Potential leads often result in dead ends, and an affiant need not include all aspects of an investigation.  Here, however, the omitted information was not neutral.  The witnesses did not testify that they were ignorant of the Whartons' living arrangements.  Rather, the Wharton children and grandchildren affirmatively stated that the Whartons lived separately.  This was not a matter of omitting information because it led to a dead end.

The posture of this case is also significant.  The case did not involve the kind of exigent circumstances often associated with a search warrant, where law enforcement must act with haste.  This case had been pending for several months; Ms. Wharton was indicted more than six months earlier.  As a result, the government was well aware of the defense's position which, if established, could jeopardize the viability of the government's case.  Yet, it chose not to disclose

to the magistrate judge any of the information in its possession that supported Ms. Wharton's claims.

At oral argument, the government argued that suppression was not warranted because, when officers executed the search warrant, Mr. Wharton's belongings were indeed found in Ms. Wharton's bedroom.  In particular, government counsel asserted that Mr. Wharton's cell phone and what was believed to be his cane and medicines were located in Ms. Wharton's bedroom, and several other items were found in other parts of the house's common areas.  However, in assessing the validity of a search warrant, the court must look only to the information known at the time the warrant was issued.  The ends cannot be used to justify the means.  *See United States v. Byars*, 273 U.S. 28, 29–30 (1927) ("A search prosecuted in violation of the Constitution is not made lawful by what it brings to light."); *Garrison*, 480 U.S. at 85 ("Those items of evidence that emerge after the warrant is issued have no bearing on whether the warrant was validly issued."); *see also United States v. Foster, supra,* 634 F. 3d at 249.  Thus, the items that were actually found during the search have no legal import.

In my view, Magistrate Judge Gallagher would not have issued the warrant with regard to Ms. Wharton's upstairs bedroom had she been presented with all of the information in Agent Gray's possession that was germane to the subject of the Whartons' living arrangements.  However, I believe Magistrate Judge Gallagher would have issued the warrant with regard to the other areas of the house.  The economic evidence of shared utility and cable bills is much more probative as to those areas.  Additionally, John Wharton was present in the dining room during the agents' interview with Ms. Wharton.  Moreover, Ms. Muriel's grand jury testimony about her parents' living arrangements revealed that John Wharton "occasionally . . . would come up to

cook in the kitchen. . . . But then the dining room and all of that is open up [sic], too." Def. Hrg.

Exh. 9.  Similarly, Lasean Wharton indicated in his June 3, 2013 interview with Agent Gray that,

although his parents slept in separate bedrooms, they "share a kitchen and common areas."

     In light of this information, there was a "fair probability" that evidence relating to John

Wharton's alleged identity fraud would be found in the areas of the house other than the upstairs

bedroom of Ms. Wharton.  Accordingly, the omissions were not material as to the common areas

of the house.

     The government argues that, even if the information about the Whartons' living

arrangements should have been disclosed to the magistrate judge, the good faith exception to the

exclusionary rule recognized in *Leon* applies and allows introduction of the disputed evidence.

In establishing a good faith exception, *Leon* provided for the admissibility of evidence seized

pursuant to a warrant subsequently determined to be invalid, if the executing officers' reliance on

the warrant was "objectively reasonable." *Leon*, 468 U.S. at 922; *see also Herring v. United

States*, 555 U.S. 135, 145 (2009); *United States v. Doyle,* 650 F.3d 460, 467 (4th Cir. 2011);

*United States v. Perez,* 393 F.3d 457, 461 (4th Cir. 2004).  In explaining its holding, the *Leon*

Court stated, 468 U.S. at 922: "We conclude that the marginal or nonexistent benefits produced

by suppressing evidence obtained in objectively reasonable reliance on a subsequently

invalidated search warrant cannot justify the substantial costs of exclusion."  In the companion

case of *Massachusetts v. Sheppard*, 468 U.S. 981, 989–90 (1984), the Supreme Court added:

"[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him . . .

that the warrant he possesses authorizes him to conduct the search he has requested."

*Leon* made clear that there are four circumstances when exclusion of evidence remains the appropriate sanction, even if an officer has obtained a warrant and abided by its terms. *Leon*, 468 U.S. at 922. This is because "the officer's reliance on the magistrate's probable-cause determination . . . must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23 (citations and footnotes omitted).

The four situations when the sanction of exclusion is an appropriate remedy are as follows: 1) if the magistrate or judge who issued the warrant was misled by information in an affidavit that the affiant knew was false or would have known but for his reckless disregard for the truth; 2) if the issuing magistrate wholly abandoned his judicial role; 3) the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; 4) the warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923; *see United States v. DeQuasie*, 373 F.3d 509, 519-520 (4th Cir. 2004).

In making a *Leon* good faith determination, courts may look "outside the four corners of a deficient affidavit when determining, in light of all the circumstances, whether an officer's reliance on the issuing warrant was objectively reasonable." *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011). And, a law enforcement officer has a duty to withhold from presentation an application for a warrant that a well-trained officer would know failed to establish probable cause. Accordingly, notwithstanding authorization from a judge to conduct a

search, good faith does not apply if a "reasonably well trained officer would have known that the search was illegal . . . ." *Leon*, 468 U.S. at 922 n.23.

Against this background, I am mindful of what the Supreme Court said in *Davis v. United States,* ____ U.S. ____, 131 S. Ct. 2419 (2011), in regard to the exclusionary rule.  Exclusion of evidence is "not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search." *Id.* at 2426.  Rather, its purpose is to "deter future Fourth Amendment violations." *Id.*  As the Fourth Circuit said in *United States v. Wilks*, 647 F.3d 520, 523 (2011), "[e]xclusion of evidence only is appropriate if the deterrence benefits of suppression outweighs the heavy societal costs of exclusion." *Id.*

The good faith exception does not apply in the circumstances prevailing here.  The *Leon* Court specifically addressed the interplay of its ruling with its prior ruling in *Franks*, stating: "Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 897 (citing *Franks*).  Similarly, the Fourth Circuit has indicated: "A warrant that violates *Franks* is not subject to the good-faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897 (1984)." *Colkley*, 899 F.2d at 300.

For the foregoing reasons, any evidence recovered from Ms. Wharton's upstairs bedroom during the search of the Utrecht Road house on July 2, 2013, is not admissible at trial against Ms. Wharton.  This ruling does not inure to the benefit of Mr. Wharton, however, based on standing.

*See* note 2, *supra*.  Moreover, any evidence found in the other areas of the home will not be suppressed.[9]

## B.  The Statements

Defendants have moved to suppress statements they made to two agents from the Social Security Administration's Office of the Inspector General during an interview conducted at their home on August 27, 2012.

Statements obtained from a defendant during custodial interrogation may violate the Fifth Amendment's self-incrimination clause, and would be inadmissible in the government's case-in-chief, unless the government can demonstrate that law enforcement officers adequately informed the defendant of his *Miranda* rights and obtained a valid waiver of those rights.  *See Miranda v. Arizona*, 384 U.S. 436, 457–58 (1966); *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984); *United States v. Cardwell*, 433 F.3d 378, 389 (4th Cir. 2005).  The statements also must have been voluntary.  *See Dickerson v. United States*, 530 U.S. 428, 444 (2000).  And, the voluntariness and *Miranda* custody inquiries are not the same.  *United States v. Hashime,* 734 F.3d 278, 285 (4th Cir. 2013).

The threshold question, of course, is whether the defendants were in custody.  Whether a person is in custody under a Fifth Amendment analysis turns on whether there was a formal arrest or restraint on freedom of movement to the degree associated with a formal arrest.  *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1997); *Berkemer*, 468 U.S. at 440; *Hashime*, 734 F.3d at 282; *United States v. Hargrove*, 625 F. 3d 170, 178 (4th Cir. 2010).  The Supreme Court has

---

[9] I stress that my ruling is not intended to impugn Agent Gray's credibility or his motives. When Agent Gray testified before the Court, he was credible and appeared to be competent and reliable.  My ruling is only that Agent Gray made an error in judgment by not including all pertinent information in his warrant application, and that the error was reckless.

described the test for whether an individual is "in custody," notwithstanding the lack of a formal arrest, as whether, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'"  *Berkemer*, 468 U.S. at 440 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).  This inquiry is an objective one.  "Custody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned. . . ."  *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001).  "The relevant inquiry is how a reasonable man would have understood the suspect's position at the time."  *Id.* at 419.  In other words, the operative question is whether, viewed objectively, a "reasonable man in the suspect's position would have understood his situation" to be one of custody.  *Berkemer*, 468 U.S. at 442; *see United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007).

To be sure, the Supreme Court has observed: "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."  *Oregon v. Mathiason*, 429 U.S. 492, 495 (per curiam).  But, the police must provide the suspect with *Miranda* warnings only if there is a custodial interrogation.  *Id.* (holding law enforcement officials are not required to administer *Miranda* warnings to everyone they question).

The determination of custody is made by examining "all of the circumstances surrounding the interrogation" and determining "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'"  *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (per curiam) (quoting *Berkemer*, 468

U.S. at 440).  In other words, "the court considers whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'"  *Hashime,* 734 F.3d at 282–83 (quoting *United States v. Jamison,* 509 F.3d 623, 628 (4th Cir. 2007)) (other citations omitted).

Merely because a suspect is the focus of a law enforcement inquiry does not mean that he is in custody for *Miranda* purposes; it is the perception of a "reasonable person" under the circumstances which determines whether *Miranda* warnings should be given.  *Beckwith v. United States,* 425 U.S. 341 (1976).

Facts relevant to the custody determination include, but are not limited to, "'the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.'"  *Hashime,* 734 F.3d at 283 (quoting *United States v. Day,* 591 F.3d 679, 696 (4th Cir. 2010)) (other citations omitted).  Physical restrictions and the suspect's isolation and separation from family are also pertinent. *Hashime,* 734 F.3d at 283.  Here, the totality of the circumstances readily supports the finding that reasonable persons in the defendants' position would have understood that they were not "in custody" during the interview at their home in August 2012.

Even if the interview was not custodial, defendants argue that the statements were made involuntarily.  Therefore, they contend that introduction of the statements at trial would violate their rights under the Fifth Amendment to the United States Constitution.  I disagree.

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda,* 384 U.S. at 478.  To resolve whether a statement or

confession was obtained involuntarily, in violation of the Fifth Amendment, "[t]he proper inquiry 'is whether the defendant's will has been overborne or his capacity for self-determination critically impaired.'"  *United States v. Braxton,* 112 F.3d 777, 780 (4th Cir. 1997) (en banc) (quoting *United States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir. 1987) (internal quotation marks omitted)).  To make this determination, courts must consider "'the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.'"  *United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014) (quoting *Pelton,* 835 F.2d at 1071).

The Fourth Circuit has "consistently declined to hold categorically that a suspect's statements are involuntary simply because police deceptively highlight the positive aspects of confession."  *Umana*, 750 F.3d at 344.  For example, in *Rose v. Lee*, 252 F.3d 676, 686 (4th Cir. 2001), the Court held that "the cryptic promise that 'things would go easier' on [the suspect] if he confessed [did not] amount[ ] to unconstitutional coercion."  Similarly, "'misrepresentations [by a government agent] are insufficient, in and of themselves, to render a confession involuntary.'"  *United States v. Whitfield*, 695 F.3d 288, 302 (4th Cir. 2012) (quoting *Johnson v. Pollard*, 559 F.3d 746, 755 (7th Cir. 2009)), *cert. denied,* 133 S. Ct. 1461 (2013); *see also United States v. Breeden*, 149 F. App'x 197, 202 (4th Cir. 2005).  And, "the mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary."  *Braxton*, 112 F.3d at 780.  In all cases, the determinative factor is whether the defendant's will was overborne.

Cases in which courts have found that a defendant's will was overborne are few and far between, and they universally involve circumstances that scream out for judicial intervention.

For example, in a case cited by defendants, *Davis v. State of North Carolina*, 384 U.S. 737 (1966), the defendant was held in detention for sixteen days and interrogated daily under coercive circumstances.  In another case cited by defendants, *Spano v. New York*, 360 U.S. 315 (1959), police officers questioned an uneducated defendant with "emotional instability" until 3:00 a.m. at the police station, ignored the defendant's requests to contact an attorney, and leveraged a personal relationship the defendant had with a policeman in order to extract a confession.

In contrast, the court in *United States v. Plumman*, 409 F.3d 919, 924-25 (8th Cir. 2005), found that statements made during a non-custodial interview were voluntary in the following circumstances:

> The magistrate judge noted Agent McGrane did not employ strong-arm or deceptive tactics during the interview, but instead used permissible small talk and rapport-building techniques to make Plumman more comfortable with the difficult subject matter and to gain Plumman's trust and goodwill. The magistrate judge noted the interview, to some extent, was police dominated because there were two FBI agents inside the vehicle. . . .  During the interview, Plumman was not handcuffed or otherwise physically restrained. The magistrate judge also noted Agent McGrane's unlocked vehicle was parked in Plumman's driveway in a residential neighborhood during the daytime in full view of passing traffic.  Agent McGrane testified that, although armed, neither he nor Agent McRoden displayed their firearms, and no other weapons were visible inside the vehicle.
>
> The FBI interview lasted a considerable period of time, an estimated three and one-half hours without intervening breaks.  Agent McGrane testified Plumman never requested a meal or bathroom break and never asked to stretch his legs. . . . Importantly, the magistrate judge noted Plumman was not arrested following the FBI interview.

The circumstances of the interview of defendants on August 27, 2012, do not even approach those that would render a statement involuntary.  On August 27, 2012, Agent Gray and Special Agent Santoro, both with the Social Security Administration Office of Inspector General,

- 39 -

interviewed the Whartons at their Utrecht Road house.  Agent Gray had scheduled the interview by leaving a contact card for Ms. Wharton at the home, and Ms. Wharton called him back and set up a time for the interview.

When the agents entered the house, they were wearing khakis and polo shirts.  They identified themselves as SSA OIG federal law enforcement officers.  Although they were carrying guns, the weapons were covered by the agents' polo shirts.  At no time did the agents comment about, remove, or gesture toward their weapons.  Although Agent Gray did not advise the Whartons of their *Miranda* rights, he informed them that the interview was voluntary, that they were not in police custody, and that they could stop answering questions at any time.  The agents then advised the Whartons that they were investigating alleged representative payee misuse.  *See* Mot. Hrg. Tr. 2 at 80–97, 116–18.

Upon their arrival, the agents did not know that Mr. Wharton would be present.  His appearance was completely of his own doing.  The following testimony is relevant as to Mr. Wharton's presence at the interview, *id.* at 81–82:

The Court: Did you know Mr. Wharton would be present when you got there?

Agent Gray: I did not.

Government: Did you permit Mr. Wharton to sit in on the interview?

Agent Gray: Yes. It's standard practice that if somebody you were interviewing, because it's voluntary, we explain to them it's a voluntary interview, they can have whomever they like at the interview. We don't preclude them from bringing anyone. With the understanding that we're going to be discussing Social Security information, which could be, which could be sensitive.

The interview unfolded over a course of two hours and was conducted in a conversational, polite tone.  Mr. and Ms. Wharton sat next to each other at the dining table, with

the agents across the table from them.  As noted, Mr. Wharton sat in on the interview at his initiative.  And, he volunteered various statements throughout, although he was not questioned.

At the time of the interview, the agents were only investigating possible unlawful receipt of benefits by Ms. Wharton.  However, when Agent Gray saw that Mr. Wharton was present, "that obviously piqued [his] interest and reminded [him] of the fact that somebody had said that they were living together." *Id.* at 141.

During the interview, Ms. Wharton did not give any indication that she misunderstood any questions, nor did Mr. Wharton.  And, there was nothing unusual about Mr. or Ms. Wharton's demeanor during the interview.  Nor did Agent Gray perceive that Mr. Wharton had any difficulty understanding or hearing the agents' questions.  At no time did Mr. or Ms. Wharton request termination of the interview.  *Id.* at 96–98, 110–20.

The facts recounted above, testified to credibly by Agent Gray and not contradicted by any testimony from Mr. or Ms. Wharton, reveal that the interview took place in a relaxed, neutral environment without any signs of coercion, manipulation, or deceit.

The only factor cutting in favor of Ms. Wharton's argument is that, as the Court held in its Memorandum Opinion of May 1, 2014, "Ms. Wharton has some cognitive limitations."  ECF 109 at 29.  As Ms. Wharton points out, "if a defendant has a mental impairment that was known or reasonably apparent to the investigators, they must exercise special care." *United States v. Hall*, 93 F.3d 1337, 1346 (7th Cir. 1996).[10]  However, Ms. Wharton's mental impairment, standing alone, cannot transform the comments she made during an interview in her own home

---

[10] Ms. Wharton received disability benefits based on cognitive limitations, which would have been known to the agents.  But, in connection with the competency hearing, the government contested the extent of Ms. Wharton's disability.

into involuntary statements obtained in violation of her constitutional rights.  Indeed, she seems

to admit as much when she notes: "There are numerous cases where mental impairment, *along

with other factors*, was found sufficient to render confessions involuntary or were otherwise

considered relevant in the analysis."  ECF 126 at 3 (emphasis added).  Completely lacking here

are the "other factors" present in the cases on which Ms. Wharton relies.

Accordingly, the motion to suppress the statements will be denied.

### C.  Motion to Sever

Mr. Wharton filed a Motion to Sever on October 7, 2013.  *See* ECF 36.  However, it

appears that Mr. Wharton is no longer pursuing the severance motion.  Accordingly, I will deny

the motion, without prejudice to its renewal within 10 days of the date of the accompanying

Order.

### Conclusion

For the foregoing reasons, the motion to suppress the search will be granted, in part, and

denied, in part.  The motion to suppress the defendants' statements made on August 27, 2012,

will be denied.  And, the motion to sever will be denied, without prejudice.  A separate Order

follows.


Date: August 12, 2014                              _____/s/_____

                                                   Ellen Lipton Hollander
                                                   United States District Judge